# In the United States Court of Federal Claims

No. 08-758C

(Filed:   July 8, 2011)
_____

|  |  |  |
|---|---|---|
| ROGER A. HOUSE, | * | Military pay case; Motion to dismiss or, in |
| | * | the alternative, for judgment on the |
| Plaintiff, | * | administrative record; Wrongful conviction; |
| | * | Military Pay Act – money-mandating |
| | * | statute; Voluntary vs. involuntary separation; |
| v. | * | Presumption of voluntariness – rebuttable |
| | * | where coercion; Role of wrongful conduct; |
| THE UNITED STATES, | * | *Roskos*; *Christie* – three-part coercion test; |
| | * | Even where wrongful conduct, claimant |
| Defendant. | * | must show he had no choice but to resign or |
| | * | retire; Resignation voluntary; Back pay |
| | * | based upon promotion; No automatic |
| | * | promotion under 10 U.S.C. § 624(d); *Lewis* |
| | * | and *Dysart* applied; Relief denied. |
| | * | |

_____

**OPINION**
_____

*John B. Wells*, Slidell, LA, for plaintiff.

*Stacy K. Grigsby*, Civil Division, United States Department of Justice, Washington, D.C., with whom was Assistant Attorney General *Tony West*, for defendant.

**ALLEGRA, Judge:**

While a Navy officer, the plaintiff in this military pay case was court-martialed on charges relating to the sexual assault of a sailor.  Subsequently, he resigned from the Navy. After the filing of this case, investigations revealed that the DNA evidence used to convict plaintiff was faulty (and perhaps fraudulent), leading the Navy Judge Advocate General to set aside plaintiff's conviction.  At issue is whether plaintiff's resignation from the Navy prevents him from receiving compensation under the Military Back Pay Act.  For the reasons that follow, the court concludes that it does.

## I.    BACKGROUND

Roger A. House (plaintiff) enlisted in the United States Navy on September 26, 1983.  On November 1, 1992, he was commissioned as an officer in the United States Navy Medical Service Corps.  Lieutenant House eventually was chosen by the Surgeon General of the Navy to be his Executive Assistant.  But before he could assume that position, he and two fellow officers (Lieutenants Williams and Harris) were charged with various crimes stemming from the alleged rape of a junior enlisted female.  Mr. Phillip Mills, a forensic biologist for the U.S. Army Criminal Investigation Laboratory (USACIL), presented key evidence at the court-martial of the three officers.  Mr. Mills testified that DNA (skin cells) taken from a condom found in the trash at Lieutenant Harris' house linked plaintiff to the assault.[1]  Concerned with the accuracy of the DNA results, plaintiff's counsel unsuccessfully sought to have this evidence independently tested.  On January 31, 2002, plaintiff was acquitted of most of the crimes for which he was charged, including the charge of forcible rape, but was convicted of three charges: conduct unbecoming of an officer, conspiracy to make a false statement, and providing a false statement under oath.[2]

Two months later, in March of 2002, the Navy Staff Lieutenant Commander Selection Board recommended that plaintiff be promoted to Lieutenant Commander.  Because of the prior conviction, however, the Navy, in an August 2002, letter, informed plaintiff that while he would "be included in the selection board report," his name would be withheld from the "All Navy" (ALNAV) message that promulgated the board results because of adverse information.  The letter further explained that Department of Defense Instruction 1320.4 required the Secretary of the Navy to consider any adverse information concerning officers selected for promotion.  It went on to state that "no final decision ha[s] been made" with respect to plaintiff's promotion and that he had the opportunity "to present the Secretary of the Navy with as much information as possible."  Lieutenant House responded to this letter with two letters of his own, dated September 10, 2002, and January 13, 2003, respectively.  In those letters, he took "full responsibility for violations of the Uniformed Code of Military Justice for which a guilty finding . . . was adjudged," requested an opportunity to stay with the Navy, and asked the Navy to act upon the Board's promotion recommendation.

On December 13, 2002, the convening authority approved the court-martial sentence and ordered plaintiff to pay a $1,000 fine.  The convening authority also issued a letter of reprimand.

---

[1]  Indeed, a preliminary investigation had recommended that Lieutenant House not be charged at all, suggesting that but for the DNA evidence supplied by Mr. Mills, Lieutenant House would not have been court-martialed.

[2]  Lieutenant Harris was convicted of conduct unbecoming an officer, conspiracy to make a false statement, providing a false statement under oath, and sodomy.  Lieutenant Williams was convicted of conduct unbecoming an officer, conspiracy to make a false statement, and providing a false statement under oath.

Because of the court martial, the Navy initiated a procedure under SECNAVINST 1920.6B requiring plaintiff to show cause why the Navy should retain him.  Based on the information it received, the board found that Lieutenant House had committed misconduct, but by a split vote of 2-1 recommended that the Navy retain him.  Following this ruling, Lieutenant House was no longer subject to administrative separation processing, pursuant to both Navy regulations and statute.  *See* SECNAVINST 1920.6B (Dec. 13, 1999); *see also* 10 U.S.C. § 1182.  Thereafter, he was counseled by several peers and superiors that his career was finished and that he should seek retirement.  In June 2003, Lieutenant House submitted a retirement request.  The Navy approved this request and plaintiff retired at his current rank of Lieutenant, effective October 1, 2003.

After retiring, plaintiff filed an Article 69 review challenging his court-martial conviction.  In December of 2004, the Navy Judge Advocate General (the Navy JAG) set aside his conviction for false swearing.  On July 27, 2005, Lieutenant House then filed a petition for extraordinary relief in the nature of a writ of mandamus and a petition for review under Uniform Code of Military Justice, Article 69(d), 10 U.S.C. § 869(d), with the United States Navy-Marine Corps Court of Criminal Appeals.  The petition was denied on August 18, 2005.  On September 6, 2005, he filed a writ of appeal in the United States Court of Appeals for the Armed Forces (CAAF); this appeal was denied on December 12, 2005.  Lieutenant House then filed a petition for certiorari, which the Supreme Court denied on April 17, 2006.  *See House v. United States*, 547 U.S. 1072 (2006).

On or about September 29, 2005 – after Lieutenant House filed his appeal with CAAF, but before the Supreme Court denied his petition for certiorari – plaintiff learned that Mr. Mills, the DNA expert who had testified at his court-martial, was being investigated by the USACIL for contaminating samples during his testing procedures and falsifying DNA entries.  Armed with this information, on October 4, 2005, plaintiff filed a petition for a new trial.[3]  On August 31, 2006, the Navy JAG denied the petition as untimely.  Attempts to overturn this decision proved unsuccessful.  Unbeknownst to plaintiff, in October of 2006, as a result of the misconduct investigation being conducted on Mr. Mills, the USACIL retested the DNA used to obtain his conviction.  The retesting results, which were summarized in a November 17, 2006, report, excluded plaintiff and his codefendants as being the sources of the DNA that was used earlier to link them to the sexual assault.  For reasons unexplained, this exculpatory information was provided neither to plaintiff nor to his counsel at or around the time it was discovered.

---

[3]  In 2005, the USACIL published two memoranda outlining problems related to Mr. Mills' work, including the cross-contamination of samples and false data entries.  *See United States v. Luke*, 69 M.J. 309, 325 (2011) (indicating that an October 17, 2005, USACIL memorandum identified a number of problems with Mr. Mills' work, including incidents in which he "cross-contaminated and/or switched samples," "altered documentary evidence," "entered false data regarding a control sample," "admitted to making a false data entry and creating a false document," and "misrepresented he examined evidence when he had not").  Based on the results of the USACIL investigation, Mr. Mills was removed from his position as a DNA Examiner.  He resigned in December of 2005.

On October 28, 2008, plaintiff filed a complaint in this court attacking his court-martial conviction and requesting the return of the $1,000 fine.  On April 8, 2009, the court granted the parties' joint motion to remand the case to the Office of the Navy JAG.  On May 6, 2009, plaintiff was finally notified of the DNA retesting results; this same information was forwarded to the Navy JAG.  On June 4, 2009, the Navy JAG issued an order setting aside Lieutenant House's conviction on all remaining charges and granting his request for a new trial.[4]  After this decision, on June 6, 2009, plaintiff filed an amended complaint, in which he prayed the court to: (i) restore the $1,000 fine; (ii) order his promotion to Lieutenant Commander on his scheduled promotion date along with corresponding back pay and allowances; (iii) order that his retirement grade be adjusted to Lieutenant Commander and that his retirement pay be adjusted accordingly, retroactive to his date of retirement; (iv) in the alternative, remand this case to the Board for Correction of Naval Records (BCNR) to correct his record in an appropriate manner; and (v) provide plaintiff with costs and any other relief deemed to be just and equitable.

On June 19, 2009, the court granted defendant's unopposed motion to remand the case to the BCNR.  The court ordered the BCNR to consider three matters: (i) plaintiff's claim that he was selected for a promotion by the selection board; (ii) plaintiff's claim that he was forced to retire; and (iii) any matters that plaintiff presented in writing to the BCNR regarding his separation.  In response, the BCNR, on December 16, 2009, decided to remove from plaintiff's Naval records all fitness reports referencing the court-martial conviction and to correct all references in those same records to the conviction.  The BCNR, however, denied plaintiff's request for a retroactive promotion to the rank of Lieutenant Commander and found that Lieutenant House had voluntarily requested his retirement.

Following the receipt of the BCNR decision, on February 23, 2010, defendant filed a motion to dismiss or, in the alternative, a motion for judgment on the administrative record.  On May 24, 2010, plaintiff filed a cross-motion for judgment on the administrative record.  After briefing on the motions was completed, oral argument was held on February 1, 2011.  Later,

---

[4]  In setting aside Lieutenant House's conviction for conduct unbecoming an officer, the Navy JAG found:

> The DNA evidence, as properly tested, not only fails to implicate the three defendants, but it also presents possible theories of the case and interpretations of the evidence that are favorable to the defense.  For instance, the fact that the alleged victim's cells were on the inside and outside of each condom, combined with the fact that the condoms were found outside LT Harris' house, could lead a trier-of-fact to wonder whether the alleged victim may have planted the condoms herself.  Moreover, the presence of one, if not two, unidentified males on all three of the condoms also raises significant questions.

The Navy JAG also set aside plaintiff's conviction on the one remaining charge – conspiracy to make a false statement – because he could not determine from the record which of Lieutenant House's prior statements provided the basis for the conviction.

plaintiff conceded that the Navy had returned the $1,000 fine and that this portion of his case was moot.

## II.   DISCUSSION

As just recounted, Lieutenant House has been partially successful in this matter. Defendant has moved to dismiss the remaining counts in this case under RCFC 12(b)(1) and 12(b)(6). It has, alternatively, moved for judgment on the administrative record under RCFC 52.1, asserting that plaintiff is not entitled to any of the remaining relief requested. For his part, plaintiff has filed a cross-motion for judgment on the administrative record, claiming that his retirement from the Navy was involuntary and that he is entitled to the pay and other benefits of a Lieutenant Commander, a rank to which he claims he was automatically promoted by operation of law.

### A.

Deciding a motion to dismiss "starts with the complaint, which must be well-pleaded in that it must state the necessary elements of the plaintiff's claim, independent of any defense that may be interposed." *Holley v. United States*, 124 F.3d 1462, 1465 (Fed. Cir. 1997); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The plaintiff must establish that the court has subject matter jurisdiction over its claims. *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988); *Hansen v. United States*, 65 Fed. Cl. 76, 94 (2005).

Plaintiff filed this action under the Tucker Act, 28 U.S.C. § 1491(a)(1), "which authorizes certain actions for monetary relief against the United States to be brought in the Court of Federal Claims and waives the government's sovereign immunity for those actions." *Metz v. United States*, 466 F.3d 991, 995 (Fed. Cir. 2006) (citing 28 U.S.C. § 1491). As the Federal Circuit has explained, however, "'[t]he Tucker Act does not itself provide the substantive cause of action; instead a plaintiff must look elsewhere for the source of substantive law on which to base a Tucker Act suit against the United States.'" *Chambers v. United States*, 417 F.3d 1218, 1223 (Fed. Cir. 2005); *see also Martinez v. United States*, 1295, 1303 (Fed. Cir. 2003) (en banc). With exceptions inapplicable here, that source must be "money-mandating." *Metz*, 466 F.3d at 996; *Fisher v. United States*, 402 F.3d 1167, 1172 (Fed. Cir. 2005) (en banc). It is well-established that the Military Pay Act, 37 U.S.C. § 204, upon which plaintiff relies here, qualifies as such a source. *See Metz*, 466 F.3d at 998; *Smith v. Sec'y of Army*, 384 F.3d 1288, 1294 (Fed. Cir. 2004); *James v. Caldera*, 159 F.3d 573, 581 (Fed. Cir. 1998). Accordingly, this court has jurisdiction over plaintiff's case and must deny defendant's motion to the extent it urges to the contrary.

**B.**

The Military Pay Act "provides that a member of a uniformed service who is on active duty is 'entitled to the basic pay of the pay grade to which assigned.'" *Metz*, 466 F.3d at 998 (quoting 37 U.S.C. § 204(a)); *see also Agwiak v. United States*, 347 F.3d 1375, 1380 (Fed. Cir. 2003). In *Metz*, the Federal Circuit instructed, as to this statute, that –

> a plaintiff . . . must assert and ultimately establish that his separation was involuntary in order to fit within the scope of, and take advantage of, the money-mandating status of [the Military Pay Act] or else his claim falls for failure to state a claim upon which relief can be granted.

466 F.3d at 998; *see also Siemietkowski v. United States*, 86 Fed. Cl. 193, 197 (2009); *Lopez-Velazquez v. United States*, 85 Fed. Cl. 114, 136 (2008); *Wright v. United States*, 81 Fed. Cl. 369, 374 (2008).[5] In other words, a decision to retire or resign that is freely made effectuates the service member's complete separation from military service – a separation that, after it becomes effective, may not be revoked or withdrawn, even via court order. To avoid this result – and thereby to invoke properly the Military Pay Act – a service member must show that his resignation was involuntary and thus is the legal equivalent of his being removed from service. *See Pitt v. United States*, 420 F.2d 1028, 1032-34 (Ct. Cl. 1970) (describing the rationale for the voluntary/involuntary distinction). Defendant asserts that, despite his wrongful conviction, plaintiff's separation from the Navy was voluntary and that this court, therefore, should enter judgment on the administrative record in its favor.[6]

Where a member of the military resigns or retires, his decision is presumed to be voluntary. *See, e.g.*, *Moyer v. United States*, 190 F.3d 1314, 1320 (Fed. Cir. 1999); *Tippett v.*

---

[5] In *Metz*, the Federal Circuit made clear that "the issue of the voluntariness of a plaintiff's discharge is not jurisdictional; rather, it is a question that should be considered in the context of the merits of a plaintiff's case in determining whether a plaintiff can take advantage of [the Military Pay Act's] money-mandating status." 466 F.3d at 998; *see also Ancman v. United States*, 77 Fed. Cl. 368, 374 (2007).

[6] Notably, the Federal Circuit, in *Metz*, seemed to suggest that the issue of voluntariness should be decided via a motion to dismiss under RCFC 12(b)(6), rather than via a motion for judgment on the administrative record. But, while the court, in the language quoted above, indicated that the claim of a plaintiff who cannot establish the involuntariness of his resignation "falls for failure to state a claim upon which relief can be granted," it went on to analyze the case, which involved the review of a Board decision, under the standard applicable to motions for judgment on the administrative record. 466 F.3d at 998. This court will do the same. That requires this court to resolve factual questions by reference to the administrative record, "as if it were conducting a trial on [that] record." *Bannum, Inc. v. United States*, 404 F.3d 1346, 1357 (Fed. Cir. 2005); *see also Int'l Outsourcing Servs., LLC v. United States*, 69 Fed. Cl. 40, 46 (2005).

*United States*, 185 F.3d 1250, 1255 (Fed. Cir. 1999); *Moody v. United States*, 58 Fed. Cl. 522, 524 (2003).  It is a plaintiff's burden to demonstrate otherwise, essentially showing that his decision was not freely made.  That proof may consist of evidence that the resignation or retirement:  (i) resulted from deception or misrepresentation by a government official, *Moyer*, 190 F.3d at 1320; *Scharf v. Dep't of the Air Force*, 710 F.2d 1572, 1574-75 (Fed. Cir. 1983); (ii) was made while "the claimant [was unable] to understand the voluntariness of his actions due to mental incompetence," *Warren v. United States*, 41 F. App'x 408, 410 (Fed. Cir. 2002) (citing *Scharf*, 710 F.2d at 1574); or (iii) was procured through duress or coercion, *Tippett*, 185 F.3d at 1255; *Christie v. United States*, 518 F.2d 584, 587 (Ct. Cl. 1975).  The presumption of voluntariness is not rebutted by showing that the service member faced an inherently difficult situation, as where his choice was limited to one of two unpleasant alternatives – "a choice, as the poet says, between . . . 'Scylla and Charybdis.'"  *Christie*, 518 F.2d at 591 (Skelton, J., dissenting); *see also Dorrall v. Dep't of Army*, 301 F.3d 1375, 1381 (Fed. Cir. 2002); *Covington v. Dep't of Health & Human Servs.*, 750 F.2d 937, 943 (Fed. Cir. 1984).  Under this view, a resignation is deemed voluntary even where offered to avoid a court-martial or other serious discipline.[7]

Here, of course, plaintiff's resignation occurred not only after his conviction and sentencing, but also after two Navy boards had recommended, respectively, that he be promoted to Lieutenant Commander and allowed to remain in the Navy.  And while his resignation came after plaintiff was notified that his promotion was under review, it arose before any final decision on his promotion was made.  All these facts taken together, defendant argues, indicate that plaintiff's resignation was voluntary – that he can in no way be viewed as having been coerced into making that decision.  And, on remand, the BCNR so found.[8]  Nevertheless, it cannot be

---

[7]  *See Christie*, 518 F.2d at 587; *see also*, *e.g.*, *Moody*, 58 Fed. Cl. at 525-26 (resignation voluntary even when plaintiff accepted pretrial agreement and resigned in face of impending court-martial); *Scarseth v. United States*, 52 Fed. Cl. 458, 468 (2002) (same when plaintiff resigned in face of impending court-martial); *Gallucci v. United States*, 41 Fed. Cl. 631, 645 (1998) (same when plaintiff resigned in the face of a recommendation for administrative discharge); *Brown v. United States*, 30 Fed. Cl. 227, 229-30 (1993) (same when plaintiff resigned "for the good of the service" following a recommendation of trial by court-martial), *aff'd*, 26 F.3d 139 (Fed. Cir. 1994) (table).

[8]  The BCNR concluded in this regard:  "The Board does not recommend favorable action regarding Petitioner's request for promotion to lieutenant commander and retirement in that grade.  In this regard, the Board finds that petitioner did voluntarily request the retirement that has made him ineligible for promotion."  Although the BCNR did not cite any specific facts in support of this conclusion, this court must "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned."  *Bowman Transp., Inc. v. Arkansas-Best Freight Sys.*, 419 U.S. 281, 286 (1975); *see also Nat'l R.R. Passenger Corp. v. Bos. & Maine Corp.*, 503 U.S. 407, 419-20 (1992); *Colo. Interstate Gas Co. v. Fed. Power Comm'n*, 324 U.S. 581, 595 (1945).  In the court's view, the BCNR's decisional path may reasonably be discerned here, particularly given the abundance of case law that marks this path.

denied that plaintiff's retirement decision was influenced heavily by conduct taken on behalf of the military that proved to be wrongful.  While it has not been shown when Navy or Army officials first knew (or should have known) about Mr. Mills' malfeasance, there is no doubt that the DNA evidence presented by that expert linked plaintiff to the alleged sexual assault, thereby directly leading to his conviction.  Likewise, there is no reasonable doubt that the same evidence, when properly tested, exculpated Lieutenant House.  No lesser authority than the Navy JAG so found.  In these circumstances, it seems fair and appropriate to hold defendant accountable for the wrongful acts committed by Mr. Mills, who, at the time of his conduct, plainly was acting within the scope of his employment.  *See* Rest. (Third) Agency § 2.04 (2005); *see also id*. at cmt. b; *Harbury v. Hayden*, 522 F.3d 413, 422-23 (D.C. Cir. 2008) (applying this Restatement provision to the United States).

The question, though, is whether Mr. Mills' wrongful conduct – and the apparently wrongful conviction triggered by his false (or at least inaccurate) testimony – obliges this court to treat Lieutenant House's separation as involuntary.  As it turns out, there is considerable authority on this question.

A good starting point for this discussion is *Roskos v. United States*, 549 F.2d 1386 (Ct. Cl. 1977).  There, an employee of the Internal Revenue Service (IRS) received notice of a proposed adverse action under which he was to be demoted to a nonsupervisory position and transferred at that lower grade from Scranton (where he had worked for twenty-one years) to Philadelphia.  *Id*.  The IRS proposed this action because it believed that Roskos had failed to report promptly information about a subordinate's improper conduct.  *Id*. at 1387.  At the time that he received notice of this proposed action, Roskos was twice advised of his right to retire, even though he had expressed no interest in doing so.  *Id*.  He was detailed to Philadelphia immediately.  *Id*.  After Roskos appealed this action, but before the Civil Service Commission could hear his case, the IRS modified its action, eliminating the demotion in lieu of a short suspension, but still reassigning Roskos to Philadelphia.  *Id*.  Roskos then filed a formal grievance with the agency; before that grievance could be heard, he retired.

Subsequently, Roskos filed suit in the Court of Claims seeking back pay from the time of his retirement and for reinstatement to his supervisory position in Scranton.[9]  *Id*. at 1387.  Subsequently, the defendant moved for summary judgment, claiming that the case should be dismissed because the retirement was voluntary; the plaintiff cross-moved for summary judgment, claiming that his retirement was involuntary.  *Id*.  at 1387-88.  Writing on behalf of a unanimous court, Judge Oscar Davis ruled for the plaintiff.  He wrote "that [the] reassignment, . . . was not valid as a discretionary managerial determination but was either an improper effort to pressure plaintiff to retire or was at the least an arbitrary and capricious adverse action."  *Id*.

---

[9]  The opinion does not reveal the statutory basis for Roskos' claim, but it appears that the claim was based on an earlier version of the Back Pay Act, 5 U.S.C. § 5596.  *Roskos* was decided before the Civil Service Reform Act of 1978, Pub. L. No. 95-454, 92 Stat. 1111, narrowed this court's jurisdiction in civilian pay matters.  *See United States v. Fausto*, 484 U.S. 439 (1988).

at 1389.  "It follows," he stated, "that Roskos' retirement in June 1972 must be characterized as involuntary," adding  that "[b]ecause [the] reassignment was invalid rather than proper, it represented an unjustifiable coercive action by the Government against plaintiff which, taken together with the fact that he was a family man, directly produced his retirement."  *Id.*  Distinguishing cases holding that an action taken in the face of unpleasant alternatives is, nonetheless, voluntary, Judge Davis explained –

> Of course, not every unpleasant arrangement or distasteful set of alternatives constitutes duress or renders an otherwise voluntary act involuntary.  But here the retirement was directly caused by the April assignment to Philadelphia which the IRS had no lawful authority to command.  An action is not voluntary if it is produced by government conduct which is wrong.

*Id.* at 1389-90.  The court concluded that "[t]he case thus falls within the principle that a resignation or retirement is vitiated if it results from coercive acts of the Government which leave the employee with no practicable alternative."  *Id.* at 1389.[10]

From time to time, over the last three decades, courts have pondered what *Roskos* meant when it stated that "[a]n action is not voluntary if it is produced by government conduct which is wrongful."  *Id.* at 1390.  Much of that attention has centered on the relationship between *Roskos* and *Christie*, the latter a case decided by the Court of Claims two years earlier.  In *Christie*, the court enunciated the now familiar formula, under which a plaintiff seeking to show that his resignation was the result of duress or coercion must show that:  (i) he involuntarily accepted the terms of the government; (ii) circumstances permitted no other alternative; and (iii) said circumstances were the result of the government's coercive acts.  *Christie*, 518 F.2d at 587; *see also Garcia v. Dep't of Homeland Sec.*, 437 F.3d 1322, 1329 (Fed. Cir. 2006) (en banc); *Fruhauf Southwest Garment Co. v. United States*, 111 F. Supp. 945, 951 (1953).  Because *Roskos* does not discuss *Christie,* litigants have occasionally argued that the three-part *Christie* test does not apply where a government official or employee has engaged in wrongful conduct – that such conduct, by itself, renders a resignation involuntary.  Plaintiff has essentially made this claim.  Under the opposing view, however, the three-part test in *Christie* controls even where there is wrongful government conduct.  Proof of such wrongful conduct, defendant has often argued, only satisfies the third prong of that test – demonstrating that there is coercion – requiring a claimant to show that the other two prongs of the *Christie* test are met, as well.

In fact, the great weight of authority favors the proposition that *Christie* applies to a case like this and that, to demonstrate involuntariness, a claimant thus must show that defendant's

---

[10]   The Court of Claims discounted the fact that Roskos, at the time of his retirement, had not characterized his action as involuntary.  549 F.2d at 1390.  In this regard, the court observed that Roskos did not know how long his appeals within the agency would take.  It found that "[f]aced as he was with a continuing wrongful transfer to Philadelphia, he did not have to wait indefinitely before trying to relieve the improper pressure on himself and his family."  *Id.* at 1390.

wrongful conduct left him with no alternative other than to retire or resign. This view is reflected both in cases that have held that wrongful conduct vitiated (or potentially vitiated) the voluntariness of a resignation and, conversely, in those that have not.

The first line of cases is exemplified by *Carmichael v. United States*, 298 F.3d 1367 (Fed. Cir. 2002). There, a discharged Navy officer filed claims for military back pay and reinstatement, asserting that he was wrongfully discharged after refusing, on religious grounds, to sign a reenlistment contract that used his social security number as his military personnel identification number (MPIN). *Id.* at 1371. He asserted that the Navy erroneously listed his discharge as voluntary. *Id.* at 1372. Dismissing the case, this court rejected Carmichael's claim that, under *Christie*, his discharge was the result of duress or coercion. *Id.* It held that any failure by the Navy to follow its religious accommodation procedures concerning Carmichael's request to change the MPIN was irrelevant or harmless, and that Carmichael did not satisfy the three prongs of the *Christie* test. The Federal Circuit reversed, ordering this court, on remand, to determine: (i) whether the Navy had wrongfully failed to follow its own rules and procedures in considering plaintiff's request, and (ii) whether any such failure "'directly caused' Carmichael's separation." *Id.* at 1376 (quoting *Roskos*, 549 F.2d at 1389-90).[11] Notably, the court went on to discuss the other two factors of the *Christie* test for voluntariness – whether Carmichael had involuntarily accepted the defendant's terms and whether the circumstances permitted no other alternative – identifying factual issues on these counts that this court needed to consider on remand. *Id.* at 1376-77. The Federal Circuit thereby left little doubt that a finding of wrongfulness on the part of the defendant would not, standing alone, require this court to find that Carmichael's retirement was involuntary.

---

[11]   The court further indicated that if Carmichael could show that the Navy wrongfully denied his request thereby causing his separation, this court was to "evaluate whether 'a reasonable employee confronted with the same circumstances would feel coerced into resigning,' *Middleton v. Dep't of Def.*, 185 F.3d 1374, 1379 (Fed. Cir. 1999), and whether the Navy can show that it would have taken the same action after following proper procedures." *Carmichael*, 298 F.3d at 1376. By way of further comment on *Roskos*, the Federal Circuit observed –

> We have stated that an employee could not reasonably feel coerced into resigning where an agency's legitimate actions merely produced "unpleasant working arrangements" or a "distasteful set of alternatives," *see Roskos*, 549 F.2d at 1390; . . . However, an agency's violation of its own procedures that would force an employee to breach his or her deeply-felt religious convictions if the employee remained in the service is not *per se* insufficient to cause an involuntary separation. *Cf. Roskos*, 549 F.2d at 1389 (holding that the hardship of employee's reassignment from Scranton to Philadelphia should only be borne if the reassignment was proper; where the reassignment was wrongful and relocation was difficult, employee's subsequent retirement was rendered involuntary).

*Id.* at 1376.

A second line of cases makes the same point, albeit more directly, in refusing to hold that government misconduct requires a *per se* finding of involuntariness. A prime example of these cases is *Veitch v. England*, 471 F.3d 124 (D.C. Cir. 2006). In that case, the D.C. Circuit rejected the claims of a Navy chaplain that he had been constructively discharged from the service in violation of his First Amendment rights to free speech and free exercise. *Id.* at 132. The chaplain "resigned" in the face of two things: a Navy report ("the Zoeller report") that had concluded that his allegations of religious discrimination were unsubstantiated, and the decision of his commanding officer to bring court-martial charges against him for disrespect of a superior officer. *Id.* at 126. Before the D.C. Circuit, the chaplain contended that these actions were taken against him, in violation of the Constitution, because he refused to endorse "pluralism" in his religious practices. *Id.* at 127. The Circuit rejected the chaplain's assertion that the Navy's wrongful conduct rendered his resignation involuntary, explaining:

> Veitch's argument seems to be that if the Navy's actions against him . . . were unlawful, then they were *per se* coercive, whether or not those actions would actually force a reasonable person in Veitch's position to resign. For this extraordinary proposition, Veitch relies on one Court of Claims case, *Roskos v. United States*, 213 Ct. Cl. 34, 549 F.2d 1386 (1977), in which the court said, "An action is not voluntary if it is produced by government action which is wrongful." *Id.* at 1389-90 (emphasis added). But in that case, the illegal act was the unauthorized transfer of the plaintiff to another city, which the court described as one that "[left] the employee with no practicable alternative [but to resign]." Thus, *Roskos*, far from announcing a new standard for challenges to government action, is entirely consistent with the Federal Circuit's tripartite duress test. The *Roskos* court simply found that "circumstances permitted no other alternative." *Carmichael*, 298 F.3d at 1372. It can hardly be claimed that the Zoeller Report left Veitch with no practical alternative but resignation. Indeed, Veitch could have appealed the results of Zoeller's investigation, but chose not to do so. Veitch thus had a "reasonable alternative" to resignation that negates the second duress requirement.

*Id.* at 128-129. The D.C. Circuit thus found that, even when wrongful conduct is alleged, an individual must show that the conduct left him no other alternative but to resign or retire.

Other cases explain this result in terms of *Roskos*'s holding that an action is involuntary only if it is "produced by" wrongful government conduct. *Roskos*, 549 F.2d at 1389-90 (citations omitted). As the Fifth Circuit explained, the quoted language in the prior sentence "clearly reflects the causative element of the *Christie* test: the employee must show by objective evidence that the government's action left him no other choice but to resign." *United States v. Thompson*, 749 F.2d 189, 194 (5th Cir. 1994). Many cases in this court have made a similar observation. *See Murphy v. United States*, 69 Fed. Cl. 593, 605 (2006); *Kim v. United States*, 47 Fed. Cl. 493, 499-500 (2000); *Gavin v. United States*, 47 Fed. Cl. 486, 491 (2000); *Bergman v. United States*, 28 Fed. Cl. 580, 586 (1993); *Tannehill v. United States*, 18 Cl. Ct. 296, 302 (1989). And still other cases not citing *Roskos* are to similar effect, among them, the Federal Circuit's decision in

*Schultz v. U.S. Navy*, 810 F.2d 1133 (Fed. Cir. 1987).  There, the court stated that to prove that a resignation is involuntary the claimant must show not only that it was "the result of improper acts of the agency," but also that "the employee's circumstances permit no alternative but to accept" the terms imposed by the agency.  *Id*. at 1336; *see also Latham v. U.S. Postal Serv.*, 909 F.2d 500, 502 (Fed. Cir. 1990).

Under a proper construction of *Roskos*, then, a potential claimant cannot rest upon a showing that an agency or officer of the United States acted wrongfully; he must also show, *inter alia*, that the wrongful conduct left him with no reasonable alternative to resigning.  Consistent with this view, courts have held that a service member's resignation is voluntary where he had the option of contesting his separation from the military through a court-martial or other proceeding.  *See*, *e.g.*, *Moyer*, 190 F.3d at 1320-21; *Kim*, 47 Fed. Cl. at 498; *Brown*, 30 Fed. Cl. at 230.  As this court explained in *Kim*:

> Plaintiff had a reasonable alternative to requesting retirement.  Although Plaintiff may have subjectively believed she had no alternative but to retire, the fact remains that Plaintiff had the option of challenging the elimination action before a Board of Inquiry. . . . A choice between two unpleasant alternatives does not make the decision to retire involuntary.

47 Fed. Cl. at 497-98 (citation omitted).[12]  These cases well illustrate that while there are instances where defendant's wrongful conduct leaves a plaintiff with no reasonable alternative, the latter situation does not spring inexorably from the former.  Indication of this may be found in still other cases in which decisions to retire or resign were held to be voluntary despite lurking allegations that a given decision was prompted by wrongful conduct.[13]  And the court sees no reason to depart from these settled principles.  Indeed, any significant relaxation of the

---

[12]    *See also Pitt*, 420 F.2d at 1033 (plaintiff's resignation from military was voluntary because his predominant purpose in resigning was to defeat court-martial jurisdiction by severing his employment connection with the Army); *Christie*, 518 F.2d at 587 (although "plaintiff chose to resign and accept discontinued service retirement rather than challenge the validity of her proposed discharge for cause . . . the fact remains, plaintiff had a choice").

[13]    *See*, *e.g.*, *Vazquez v. Merit Sys. Prot. Bd.*, 296 F. App'x 20, 23-24 (Fed. Cir. 2008) (plaintiff's resignation voluntary despite allegation that agency's improper acts created a hostile work environment leaving him no choice to resign); *Fanzen v. Merit Sys. Prot. Bd.*, 238 F. App'x 616, 619 (Fed. Cir. 2007) (same even though agency had created an intimidating and hostile environment); *Elinburg v. Merit Sys. Prot. Bd.*, 209 F. App'x 984, 985 (Fed. Cir. 2006) (same despite allegation that agency discriminated based on his race, sex, age, and national origin); *Stephens v. Dep't of Agric.*, 157 F. App'x 286, 288-89 (Fed. Cir. 2005) (same despite allegation that plaintiff was harassed by supervisor and agency took no action); *Pitt*, 420 F.2d at 1033-35 (same despite allegation that court-martial was unconstitutional); *Sinclair v. United States*, 66 Fed. Cl. 487, 492-97 (2005) (plaintiff's resignation in lieu of court-martial voluntary even when he alleged ineffectiveness of his military defense attorneys).

requirements for showing coercion or duress – even one, as here, based upon actual wrongful conduct – would severely undercut the important purposes that those requirements generally serve.[14]

Plaintiff asserts that the prospect of being passed over for promotion, with the expectation that he would later be discharged for that reason, posed an unacceptable hardship that left him with no real choice but to retire.  Undoubtedly, Lieutenant House's wrongful conviction left him with unpleasant options and perhaps justified his conclusion that the best route was for him to retire.  But, the question here is not whether resignation was the best option, but whether it was the *only* option.  And the record requires the court to answer the latter question in the negative.  Indeed, despite the injustice that Lieutenant House suffered, it cannot be overlooked that, at the time he retired, he no longer faced the possibility of imprisonment or expulsion from the service, and had been recommended for promotion.  While, for reasons discussed in greater detail below, that promotion was delayed, it remains that, at the time of his retirement, the promotion was still under review and a distinct possibility.  Lieutenant House, moreover, hardly went down without a fight – after his retirement, he pursued every avenue for appealing his conviction, culminating in the Supreme Court denying his petition for certiorari in 2006.  Lieutenant House could have pursued these appeals while still an active member of the Navy, perhaps forestalling any discharge until all his convictions were overturned.  For reasons unexplained, he chose not to do this – a choice that is understandable under the circumstances, but a choice, nevertheless.  Accordingly, the court finds that the BCNR properly found that Lieutenant House's resignation was voluntary, thereby precluding him from being reinstated as of the date of his resignation and receiving back pay.

## C.

Since plaintiff has not proven he is entitled to reinstatement and back pay, *a fortiori*, his claim for promotion to Lieutenant Commander also fails, at least to the extent that it is for the period following the effective date of his resignation.  Lieutenant House, however, also seeks back pay and allowances for an earlier period – for the time between when he claims he was promoted as a matter of law and his resignation.  More specifically, he asserts that, under 10 U.S.C. § 624(d)(4), the Navy was required to promote him on August 1, 2003, two months

---

[14]   Under plaintiff's laxer formulation of the law, nothing would prevent a service member from avoiding a court-martial or other disciplinary proceeding altogether, and then later filing suit in this court claiming that the resignation was involuntary because the threatened discipline was based upon wrongful charges or false evidence.  The service member could thereby bypass the military discipline system altogether, in favor of pursuing civil damages after-the-fact.  Of course, the voluntariness standard was designed to avoid situations just like that.  *See Pitt*, 420 F.2d at 1034-35 (upholding the voluntariness requirement in a case where a court-martial was subsequently found to have been unconstitutional); *see also Staats v. U.S. Postal Serv.*, 99 F.3d 1120, 1125 (Fed. Cir. 1996) (expressing similar concerns were the court to expand the doctrine of coercive involuntariness as to civilian employees).

before his resignation became effective.  Defendant demurs to this claim, contending that plaintiff's promotion claims are nonjusticiable.

In determining whether a claim is justiciable, courts consider "whether protection for the right asserted can be judicially molded," *Baker v. Carr*, 369 U.S. 186, 198 (1962), and "whether tests and standards exist against which a court can measure the challenged action," *Lindsay v. United States*, 295 F.3d 1252, 1257-58 (Fed. Cir. 2002).  *See also Voge v. United States*, 844 F.2d 776, 780 (Fed. Cir. 1988).  Because "'decisions as to the composition, training, equipping, and control of a military force are essentially professional military judgments,' *Gilligan v. Morgan*, 413 U.S. 1, 10 (1973), the substance of such decisions, like many other judgments committed to the discretion of government officials, is frequently beyond the institutional competence of courts to review." *Lindsay*, 295 F.3d at 1257.  Promotion decisions made by military officials or administrative bodies fall into this category and generally are nonjusticiable. *Id.*; *Doggett v. United States*, 207 Ct. Cl. 478, 482 (1975); *Tippett v. United States*, 2011 WL 1467824, at *9 (Fed. Cl. Apr. 15, 2011).  Hence, this court will not review the specific conclusions of military review boards regarding whether an officer deserved to be promoted. *Lindsay*, 295 F.3d at 1257; *see also Melendez Camilo v. United States*, 89 Fed. Cl. 671, 680 (2009) (noting that plaintiff's request for promotion to the rank of Lieutenant Colonel is plainly an impermissible request for interference with legitimate military matters).

"Not every claim arising from a military decision presents a nonjusticiable controversy, however." *Adkins v. United States*, 68 F.3d 1317, 1323 (Fed. Cir. 1995).  While "the merits of a decision committed wholly to the discretion of the military are not subject to judicial review, a challenge to the particular procedure followed in rendering a military decision may present a justiciable controversy." *Id.*; *see also Barnes v. United States*, 473 F.3d 1356, 1361 (Fed. Cir. 2007).  In particular, this court "can evaluate whether the military follows procedures mandated by statute or by its own regulations when making promotion decisions." *Barnes*, 473 F.3d at 1361; *see also Lewis v. United States*, 458 F.3d 1372, 1377 (Fed. Cir. 2006); *Dysart v. United States*, 369 F.3d 1303, 1315 (Fed. Cir. 2004); *Murphy v. United States*, 993 F.2d 871, 873 (Fed. Cir. 1993) ("[O]n procedural matters, the test or standard is inherent . . . . the court is not called upon to exercise any discretion reserved for the military, it merely determines whether the procedures were followed by applying the facts to the statutory or regulatory standard.").  It appears that plaintiff's promotion claim falls into this category and thus, despite defendant's remonstrations, is properly before the court.

On the merits, however, Lieutenant House's claim must fail.  Before he could be promoted to Lieutenant Commander, plaintiff had to be nominated, confirmed by the Senate, and appointed by the President.  *See* U.S. Const., art. 2, § 2, cl.2.[15]  None of these events happened.

_____

[15]   The Defense Officer Personnel Management Act (DOPMA), 10 U.S.C. §§ 611 *et seq.*, prescribes the procedures by which certain military officers are promoted.  That process is initiated by the Secretary of a military department, who, in response to departmental needs, "convene[s] selection boards to recommend for promotion [certain military officers] to the next higher permanent grade." *Id.* at § 611(a).  After completing its work, each selection board

Instead, in August of 2002, the Navy informed Lieutenant House that while his name would be included in the selection board report, it was being withheld from the announced board results because of "adverse information."  He was further informed that the Secretary of the Navy, acting for the President, would be considering this adverse information and that "no final decision ha[s] been made" with respect to his promotion.  Lieutenant House left the Navy in October of 2003, before this review was completed.

Nevertheless, Lieutenant House claims that he was automatically appointed to the rank of Lieutenant Commander based on 10 U.S.C. § 624(d)(4), which states –

An appointment of an officer may not be delayed under this subsection for more than six months after the date on which the officer would otherwise have been appointed unless the Secretary concerned specifies a further period of delay.  An officer's appointment may not be delayed more than 90 days after final action has been taken in any criminal case against such officer in a Federal or State court, more than 90 days after final action has been taken in any court-martial case against such officer, or more than 18 months after the date on which such officer would otherwise have been appointed, whichever is later.

As can be seen, the statute spells out no consequences for delaying an appointment beyond the time periods indicated.  Plaintiff asserts that, under this statute, his promotion was effective, as a matter of law, on August 1, 2003 – six months after he would have received his promotion had he been included on the list of nominations confirmed by the Senate.[16]  But, of course, plaintiff

"submit[s] to the Secretary of the military department concerned a written report . . . containing a list of the names of the officers it recommends for promotion."  *Id*. at § 617(a).  The Secretary concerned then reviews the report and ultimately submits it, "with his recommendations thereon, to the Secretary of Defense for transmittal to the President for his approval or disapproval."  *Id*. at §§ 618(a)-(c).  At this point, the President may remove the name of a recommended officer from a selection board's report.  *Id*. at § 618(d).  After the President has approved the board's report, thereby nominating the named officers for promotion, he forwards the report back to the Secretary of the military department concerned who "place[s] the names of all officers approved for promotion within a competitive category on a . . . promotion list, in the order of the seniority of such officers on the active-duty list."  *Id*. at § 624(a)(1).  The Senate must next confirm the nominations; if an officer is not confirmed, his name is removed from the promotion list.  10 U.S.C. § 629(b).  Once confirmed, the officer must next be appointed.  Under 10 U.S.C. § 741(d), the Secretary of Defense actually makes the appointment.  DOPMA requires that "officers on a promotion list for a competitive category shall be promoted to the next higher grade when additional officers in that grade and competitive category are needed," in the order in which the officers' names appear on the list.  10 U.S.C. § 624(a)(2).

[16]  The BCNR relied upon an opinion received from the Navy's Officer Selection Board Eligibility Branch in finding that "1 February 2003 is the date of rank and effective date

was neither included on the distributed promotion list nor confirmed by the Senate. Because none of the prerequisites for Lieutenant House's appointment had occurred, it does not appear that section 624(d)(4) was triggered, rendering somewhat moot the consequences of that statute not being followed.

That said, the Federal Circuit has held, on multiple occasions, that even where all the preconditions to an appointment have been satisfied, section 624(d)(4) does not lead to an automatic promotion. Thus, in *Dysart*, where the President removed an officer's name from the promotion list after the deadline in section 624(d)(4) had passed, the Federal Circuit held that "the language of [section 624] does not provide for automatic appointment without action by the President," but rather provides that appointments are made "'by the President, by and with the advice and consent of the Senate.'" 369 F.3d at 1313 (quoting 10 U.S.C. § 624(c)). Indeed, the court found that the statute could not constitutionally provide for automatic appointment because "military officers must be appointed pursuant to the constitutional process, which requires appointments at the discretion of the President, not automatic appointments pursuant to statute." *Id*. at 1313, 1315; *see also* U.S. Const., art. 2, § 2, cl. 2; *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 157 (1803) (Marshall, C.J.). Two years later, the Federal Circuit reaffirmed this conclusion in *Lewis*. In that case, it was not the President, but rather the Secretary of Defense, acting as the President's delegate, who removed the officer's name from the promotion list. 458 F.3d at 1379. Again rejecting the claim that the officer was automatically promoted under section 624(d)(4), the Federal Circuit held that "[t]he premise of Lewis' argument is the same as Dysart's – that section 624 provides for automatic appointment," adding that "[w]e rejected this premise in *Dysart*, and decline to revisit it now." *Lewis*, 458 F.3d at 1379; *see also Barnes*, 473 F.3d at 1363 (following *Dysart*). [17] Lieutenant House provides no persuasive basis for distinguishing these cases; indeed, because he was neither nominated nor confirmed, his claim is markedly weaker than those rejected by the Federal Circuit.

Resisting this conclusion, Lieutenant House relies on *Rolader v. United States*, 42 Fed. Cl. 782 (1999), in which this court held that an officer not removed from the promotion list on the date a "deadline" in section 624(d) expired was promoted by operation of law. *Id*. at 787. Of course, to the extent this decision is inconsistent with *Dysart*, *Lewis*, and *Barnes*, it is a legal

---

[Lieutenant House] would have been assigned, had he been promoted pursuant to his selection by the FY 2003 Staff Lieutenant Commander Selection Board."

[17]   Apart from their binding effect, there is little doubt that *Dysart* and *Lewis* were soundly decided. As the Supreme Court has explained on numerous occasions, "if a statute does not specify a consequence for noncompliance with statutory timing provisions, the federal courts will not in the ordinary course impose their own coercive sanction." *Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 159 (2003) (quoting *United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 63 (1993)); *see also Regions Hosp. v. Shalala*, 522 U.S. 448, 459 n.3 (1998) ("The Secretary's failure to meet the [statutory] deadline, a not uncommon occurrence when heavy loads are thrust on administrators, does not mean that official lacked power to act beyond it.").

nullity. *See Crowley v. United States*, 398 F.3d 1329, 1335 (Fed. Cir. 2005) ("the Court of Federal Claims may not deviate from the precedent of the United States Court of Appeals for the Federal Circuit"). But, even if *Rolader* can be reconciled with this binding precedent, it does not purport to suggest that section 624(d) would result in an "automatic" promotion where, as here, the President never nominated the officer in the first instance. Hence, plaintiff's back pay claim, predicated upon his automatic promotion to Lieutenant Commander, must also fail.[18]

## III.   CONCLUSION

Undoubtedly, the result here will leave plaintiff dissatisfied. His reputation has largely been restored. The emoluments associated therewith have not. Some might view this seeming incongruency as a blunt metaphor for the limitations of the law; others might see the same results as reflecting the court's inability to relieve a party of a self-created hardship. Either way, this court is not free to stray from the decisional path here, even to accommodate the perceived equities of a given case, particularly where that path is so well marked by the stanchions of sovereign immunity and the saddle bars of precedent.

Based on the foregoing, the court **DENIES** defendant's motion to dismiss this case. It further **GRANTS** defendant's motion for judgment on the administrative record and **DENIES** plaintiff's cross-motion for judgment on the administrative record. The Clerk is hereby ordered to enter judgment in favor of defendant. No costs.

**IT IS SO ORDERED**.

s/ Francis M. Allegra
Francis M. Allegra
Judge

---

[18]   In its cross-motion, plaintiff initially suggested that the Navy did not follow proper procedures outlined in SECNAVINST 1420.1A ¶ 23 when it removed his name from the promotion list. In response, defendant correctly notes that the record demonstrates that the Navy complied with SECNAVINST 1420.1A ¶ 23 because plaintiff's name was not removed from the promotion list, but rather his promotion was delayed, which is allowed under this naval instruction.